UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRYAN SOUSA,                                    :
      Plaintiff,                              :
                                             :
v.                                              :          3:11-cv-1839-WWE
                                             :
ARTHUR ROCQUE, JR., ROBERT                      :
KALISZEWSKI, JOANNE DRIVER,                      :
WILLIAM EVANS, and JANE STAHL,                   :
      Defendants.                             :

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Bryan Sousa filed this intentional infliction of emotional distress action against defendants Arthur Rocque, Jr., Robert Kaliszewski, Joanne Driver, William Evans, and Jane Stahl stemming from their employment together at the Connecticut Department of Environmental Protection ("DEP").

Defendants have moved for summary judgment. For the following reasons, defendants' motion for summary judgment will be granted.

## BACKGROUND

The parties have submitted statements of facts and supporting exhibits. The parties' submissions reflect that the following facts are not in dispute.

Plaintiff was employed at DEP from July 1987 to February 3, 2005. Plaintiff was a supervising sanitary engineer in the Water Bureau from 1995 until August 2003, when he transferred to the Ombudsman's office.

Defendant Arthur Rocque Jr. was Commissioner of DEP from 1997 until he retired in 2004. Defendant Jane Stahl served as Deputy Commissioner of DEP from March 1999 until she retired in 2005. Defendant William Evans has worked at the DEP as its Chief of Financial and

Support Services for over twenty-eight years.  Defendant Robert Kaliszewski served as the Ombudsman for DEP from 1991 to 2006.  Defendant Joanne Driver was a Principal Personnel Officer within the Human Resources Division of DEP from 1988 to 2005.

On October 31, 2002, plaintiff was involved in a physical and verbal altercation with co-worker Jonathan Goldman.  Both employees agreed that physical contact and harsh words were exchanged but claimed that the other party initiated the altercation.  It appeared to outside witnesses that both parties had the opportunity to walk away from the confrontation, but declined.  The employees were subjected to three days of suspension without pay.  Both Goldman and Sousa grieved the suspensions and both suspensions were upheld after union arbitration.

Before the arbitration process was final in either case, Goldman brought a civil action in state court against Sousa.  Sousa settled Goldman's claims against him through his insurance company.

Plaintiff complained about the discipline imposed upon him after the altercation.  Plaintiff also complained that he was being harassed both before and after the altercation.  He related his concern to DEP's affirmative action administrator, the State Attorney General, and various lower level DEP employees.

Plaintiff sought transfer out of the Water Bureau, and specifically, away from the second floor of 79 Elm Street, where his office was located.  With then Commissioner Arthur Rocque's approval, plaintiff was transferred to the Ombudsman's unit within the Commissioner's Office located on the third floor of the building.

On July 23, 2003, plaintiff sent an email message to colleagues that contained the

following language:

> Mobbing can often result in the death of the victim either due to illness, accident, or suicide . . . [and] workplace mobbing should be viewed as the last remaining legal means of committing homicide.

DEP human resources, concerned about the suicide and homicide language, required plaintiff to submit for a fitness for duty evaluation in response to the July 23, 2003 email message.

On September 25, 2003, plaintiff sent an email to the DEP Affirmative Action office, alleging that his supervisors were "unjustifiably suspicious" of him and had been "warned by personnel" about him.

On September 29, 2003, plaintiff was placed on leave pending results from a fitness for duty evaluation.  Plaintiff was out of the office for the entire months of October and November, and worked only one full day in December of 2003.

In his initial report, the physician, Dr. Kaloyan Tanev, indicated that he "did not have enough information to conclude whether [plaintiff] has a mental illness or not and whether he is fit for duty or not."  Dr. Tanev indicated that he needed [plaintiff's] prior medical records in order to make a fitness for duty determination.  Plaintiff was then placed on two weeks paid administrative leave to provide the necessary information for the evaluation to be completed. Plaintiff had difficulty getting his medical records released and was subsequently placed on unpaid leave for two more weeks.  Plaintiff filed a grievance over being placed on unpaid leave. Although the grievance was denied, plaintiff was ultimately paid.

Plaintiff again saw Dr. Tanev on November 20, 2003.  Dr. Tanev released him for duty on November 21, 2003, finding no "evidence that he is unfit for duty."

On December 1, 2003, Plaintiff sent defendant William Evans a letter indicating that he

would not return to work because of his "well-founded concern" for his own safety, and that he would charge the "appropriate paid leave code."

On December 5, 2003, plaintiff sent defendant Evans a fax requesting "immediate transfer to Milford or paid leave, forward and retroactive," to work from home on his various personal complaints against the Agency.  On December 11, plaintiff wrote to defendant Kaliszewski requesting that he be permitted paid leave to work from home on his personal complaints against the Agency.  Both of plaintiff's requests were denied.

Rather than returning to work, plaintiff used accumulated sick and vacation time during the month of December.

On December 23, 2003, defendant Evans met with plaintiff and plaintiff's union representatives to discuss the fact that plaintiff was cleared to return to work on December 1, 2003, but had failed to return.  As a result of the discussion, it was agreed that plaintiff would take vacation leave until the end of the year and would return to work on January 5, 2004.

Plaintiff returned to work on January 6, 2004, and immediately asked to be transferred and/or be permitted to telecommute full-time.  This request was denied.

From October 2003 through December 2004, plaintiff was absent from DEP for more than ten full months.  From January 2004 through April 30, 2004, plaintiff worked only thirty full days out of seventy-three working days.

In January and February 2004, plaintiff sent emails expressing concern over reverse discrimination and safety issues at DEP.  In response to those emails, defendant Evans and others opened an internal investigation into plaintiff's allegations.  Pursuant to Evan's request, the deputy commissioner of the Department of Administrative Services ("DAS") assigned a DAS

4

attorney, Devon Marquez, to conduct a workplace violence investigation into plaintiff's claims. Plaintiff provided extensive amounts of materials to Attorney Marquez. Marquez's investigation found no violence in the workplace violations or harassment.

In the spring 2004, plaintiff filed a union grievance alleging a hostile work environment. He requested leave to prepare materials for his grievance. Plaintiff's union representative, Joanna James thought a few hours of time in the office would suffice. James did not think the extent of time that plaintiff requested was reasonable. Defendant Kaliszewski authorized eight hours in the office to work on the grievance. Plaintiff attempted to work at the office, but could not concentrate, felt sick, and went home early on sick leave.

Plaintiff was married on May 8, 2004, and went on a honeymoon for two and one-half weeks. His last day in the office was June 10, 2004.

On July 14, 2004, plaintiff sent a medical statement from his primary care physician, Dr. Rubin W. Hirsch to DEP's Human Resources department. Dr. Hirsch's letter stated in total:

> Mr. Sousa has been coming to this office for many years for medical care. He was last seen on June 14, 2004. At that time, it was noted that his blood pressure was slightly elevated. He has been having medical issues related to his work environment and it is recommended that he stay out of work in order to more effectively manage his medical condition.

Dr. Hirsch's medical statement was insufficient to support plaintiff's medical leave, as it was not an official State Medical Certificate. By letter dated July 14, 2004, DEP personnel informed plaintiff that the medical statement was insufficient, and plaintiff indicated that he would schedule an appointment to have the form completed.

On July 16, 2004, plaintiff provided a medical leave certificate from Dr. Hirsch. Based on the certificate, DEP authorized the use of paid sick leave. The July 16, 2004 medical

certificate raised a number of questions for DEP. On July 29, 2004, Dr. Hirsch wrote DEP to indicate that he could not respond to their questions "due to doctor/patient confidentiality." In his letter, Dr. Hirsch indicated that "an independent medical evaluation would be a reasonable next step," and suggested that DEP look for a generalist to review the situation.

On August 4, 2004, DEP informed plaintiff that an independent medical evaluation ("IME") had been scheduled for him with Dr. Trapé at the UCONN Health Center. The appointment was for August 23, 2004 for one hour.  Plaintiff was instructed to make sure that his medical records were provided to Dr. Trapé prior to his appointment.

By letter dated August 3, 2004, plaintiff sent Human Resources a lengthy discussion of his workplace violence concerns, including a Request for "special leave" due to "workplace violence."  Human Resources informed plaintiff that there were no provisions for such a request and reminded him about his responsibility to attend the August 23, 2004 IME and release his medical records prior to his appointment. Human Resources also reminded plaintiff that he had to authorize Dr. Trapé to release the results of her examination to DEP.

Plaintiff showed up 45 minutes late for his August 23, 2004 IME appointment and failed to provide any medical reports to Dr. Trapé prior to his appointment. Dr. Trapé suggested that plaintiff be provided four more weeks to obtain the requisite medical information from his medical providers.  DEP honored that suggestion.

By letter dated August 24, 2004, Human Resources informed plaintiff that he was on authorized leave until September 23, 2004, but he would run out of sick leave on September 14, 2003. He would need to substitute other paid leave at that point, or be placed on unpaid leave. Human Resources also reminded plaintiff that he had to ensure that Dr. Trapé had the medical

6

materials before that date, and that he had an appointment with Dr. Trapé prior to September 23, 2004 in order for her to make a determination by that date.

On September 13, 2004, knowing that his paid sick leave was about to expire, plaintiff sent Human Resources a facsimile request to use his vacation leave. On September 16, 2004, Human Resources informed plaintiff that he needed to provide the appropriate documentation. Although he failed to comply, DEP nonetheless applied plaintiff's vacation leave so he would be paid.

On September 20, 2004, plaintiff failed to appear for his appointment with Dr. Trapé. Human Resources received a message from Dr. Trapé's staff informing them that plaintiff had called and cancelled the appointment and refused to set up a follow-up appointment. The next day plaintiff contacted Dr. Trapé's office and scheduled an appointment for October 4, 2004.

On September 22, 2004, plaintiff submitted yet another request for special paid leave to develop materials related to his workplace violence allegations. By letter dated September 30, 2004, Human Resources again reminded plaintiff that there were no provisions to authorize such leave.

By letter dated September 24, 2004, Dr. Trapé recommended that plaintiff remain on authorized leave until the October 4, 2004 appointment, and DEP honored that recommendation. Plaintiff missed his October 4, 2004 appointment with Dr. Trapé, but showed up on October 5, 2004, and claimed he made a mistake.

By facsimile and letter dated October 6, 2004, Plaintiff sent DEP Dr. Hirsch's medical certificate, and informed Human Resources that he had scheduled a follow-up appointment with Dr. Trapé on November 8, 2004.

7

On October 7, 2004 Dr. Trapé wrote to Human Resources, informing them that plaintiff had missed his two appointments, and suggesting that "strong administrative action" would be appropriate.  Based upon the medical information released to her, Dr. Trapé could not find a medical cause for plaintiff's impairment and inability to work.

By telephone call on and letter dated October 15, 2004, DEP informed plaintiff that he was to report to work on October 18, 2004, because based upon Dr. Trapé's findings, continuation of his medical leave was not approved.  DEP informed plaintiff that if he failed to appear for work on October 18, 2004, he would be placed on unauthorized leave without pay. The same day, plaintiff sent another letter to Human Resources requesting special paid leave to work on his workplace violence complaints.

Plaintiff used his accrued sick leave and vacation leave for his absences in June, July, August, September and half of October 2004.  Plaintiff did not appear for work on October 18, 2004, and after five days, a Loudermill hearing was scheduled for November 17, 2004.  During the hearing it was agreed that plaintiff would send a letter to Dr. Trapé to release information.

Plaintiff appeared for his November 12, 2004 appointment with Dr. Trapé.  As a result, Dr. Trapé found that plaintiff was not currently fit for duty and required leave until his follow-up appointment on December 13, 2004.  Nonetheless, plaintiff's leave from October 18, 2004 to November 12, 2004 remained as unauthorized leave without pay.

Plaintiff attended his December 13, 2004 appointment with Dr. Trapé. By letter dated December 14, 2004, Dr. Trapé stated that:

> [in her] medical opinion within certain degree of probability, that
> [plaintiff] is fit for duty as of 12/20/2004. However, because [plaintiff]
> continues to perceive the DEP office as an environment with

> psychological and potentially physical threats for him, I am suggesting that
> [plaintiff] be provided the accommodation of telecommuting for the initial
> 4 weeks of work.

By letter dated December 15, 2004, DEP informed plaintiff that he was expected back to work on December 20, 2004, and if he failed to attend, he would be on unauthorized leave without pay.

Human Resources corresponded and spoke with Dr. Trapé to clarify her suggestion that plaintiff be permitted to telecommute. She informed them that she had discussed telecommuting with plaintiff and told him that telecommuting would be solely within DEP's discretion. She confirmed that telecommuting was only a suggestion, and was solely within the prerogative of the agency.  Dr. Trapé confirmed that she did not make an ADA disability diagnosis.

On January 5, 2005, defendant Driver notified plaintiff that because he was absent without leave for five or more working days, and because of his offensive, indecent and abusive language, he was required to attend a Loudermill hearing on January 14, 2005.  Although plaintiff did not attend the hearing, he was represented by his union attorney.

Plaintiff was terminated from employment on February 3, 2005.  DEP cited plaintiff's unauthorized absences from work and abusive language as bases for his termination.

## **DISCUSSION**

A motion for summary judgment must be granted if the pleadings, discovery materials before the court and any affidavits show that there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a

reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Liberty Lobby, 477 U.S. at 24. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him. See Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. See Patterson v. County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

**Intentional Infliction of Emotional Distress**

In order to prevail on a claim of intentional infliction of emotional distress, four elements must be established: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the

conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the

plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."

Appleton v. Board of Educ. Of Town of Stonington, 254 Conn. 205, 210 (2000).   Here, plaintiff

has failed to make a sufficient showing that defendants' conduct was extreme and outrageous, an

essential element of his case for which he has the burden of proof.   "Whether a defendant's

conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a

question for the court to determine."   Id.   "Liability has been found only where the conduct has

been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."   Id. at

210-211.

 Here, defendants' conduct was not extreme or outrageous.  Plaintiff contends that

defendants failed to seriously address his concerns about bullying, but defendants thoroughly

investigated plaintiff's complaints, disciplined violent offenders, and relocated plaintiff away

from his adversarial co-worker.  Plaintiff also contends that his fitness for duty psychiatric

examination was unjustified.  However, plaintiff admits to sending an email to co-workers

referencing suicide and homicide.  Moreover, Dr. Trapé found that plaintiff was not fit for duty

based on the November 12, 2004 appointment.  Thus, mandated psychiatric examination was not

unreasonable.  Finally, plaintiff contends that defendants failed to accommodate his need to

either telecommute or continue his leave of absence.  Instead, defendants terminated him.

Nonetheless, defendants' decision to terminate plaintiff after he refused to return to work, despite

being medically cleared, is likewise insufficient to support a claim for intentional infliction of

emotional distress.

In the employment context, it is the employer's conduct that must be extreme or outrageous.  "An employer's adverse yet routine employment action, even if improperly motivated, does not constitute extreme and outrageous behavior when the employer does not conduct that action in an egregious and oppressive manner."  Miner v. Town of Cheshire, 126 F. Supp. 2d 184, 195 (D. Conn. 2000).  Here, the conduct of plaintiff's supervisors consisted of routine, responsive employment actions.  Plaintiff's assertions that defendants: (1) failed to properly address his concerns about bullying, (2) unjustly mandated psychiatric evaluations, and (3) failed to accommodate him are not sufficient to support a claim of intentional infliction of emotional distress.  As a matter of law, defendants' conduct was not sufficiently extreme or outrageous to allow a reasonable jury to return a verdict for plaintiff.  Therefore, defendants' motion for summary judgment will be granted.

## **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. The Clerk is instructed to enter judgment in favor of defendants and close this case.


Dated this 17th day of October, 2012 at Bridgeport, Connecticut.


_____/s/_____
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE

12

13